## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 04 2021, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Stephen J. Halbert
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

DeDe K. Connor
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE MATTER OF
R.L., D.L., and L.L.
CHILDREN IN NEED OF
SERVICES

A.L. (Mother),

*Appellant-Respondent,*

v.

INDIANA DEPARTMENT OF
CHILD SERVICES,

January 4, 2021

Court of Appeals Case No.
20A-JC-1259

Appeal from the Marion Superior
Court Juvenile Division

The Honorable Mark A. Jones,
Judge

The Honorable Beth Jansen,
Magistrate

Trial Court Cause Nos.
49D15-1910-JC-2744, 49D15-1910-
JC-2745, 49D15-1910-JC-2746

*Appellee-Petitioner.*

AND

CHILD ADVOCATES, INC.,
*Appellee-Guardian Ad Litem.*

**Altice, Judge.**

## Case Summary

A.L. (Mother) appeals from the adjudication of her children as CHINS. She contends that the Indiana Department of Child Services (DCS) failed to present sufficient evidence to support the adjudication.

We affirm.

## Facts & Procedural History

Mother has been married to R.L. (Father) for over four years. They are currently both twenty-seven years old and have two children together, D.L., who was born in October 2015, and L.L., who was born in August 2018. Mother also has an older son, R.Lu., who was born in February 2009 and whose father is deceased. D.L., L.L., and R.Lu. (the Children) are the subjects of this case. Father has three other children, each with a different woman, who are not involved with this case.

[4]     Mother and Father's marriage became "kind of really rocky" around May 2019, and they separated. *Transcript* at 71. During this time, they were involved in a domestic violence incident at Father's place of employment at a mall. A verbal argument about and in front of the Children turned into a wrestling match over a phone. When Father grabbed the phone, Mother fell to the ground. Father then went to the parking lot with D.L. Mother followed them to the car and would not let them leave. She asked a bystander to call 911. Father was arrested for this incident.

[5]     Thereafter, Mother and Father continued to live apart with the Children in Mother's care. Father spent time with the Children at Mother's home whenever he had free time, especially on Sundays. Mother described him as a good father.

[6]     On October 13, 2019, Father entered the family home without Mother's knowledge and removed hanging pictures while she was at work. Mother called 911 to report this, and she expressed her and the Children's displeasure to Father. He came later that evening with food for the family and to return the pictures. Mother and Father eventually began arguing over an iPad that Father had given to Mother and wanted back. He went through the home looking for it. According to Mother, this led to them getting "into a shoving match" and her slapping Father. *Id*. at 73. Father broke mirrors in the bedroom, while Mother called 911 and then hid her phone in the closet. Father then grabbed Mother by the hair and punched her in the face. Mother yelled to ten-year-old R.Lu. to run for help. But Father grabbed R.Lu. by the shoulders and said,

"don't make me do this." *Id*. at 16. At some point, Father found Mother's phone and shattered it. He pulled the footboard off the bed and the momentum caused the board to strike four-year-old D.L. in the head. Mother and Father stopped to make sure D.L. was alright, and then Father left the home, as Mother followed with a broken piece of glass that she used to stab the tire of Father's vehicle.

[7] When IMPD Officer Joshua Edwards responded to the scene, Father had already left, and Mother was in the front yard crying. She had bloody hands, scratches on her neck, and a contusion on her face. The Children were all present, and at least two of them were crying. Mother reported to Officer Edwards what had happened. Father was later arrested and charged with domestic battery. A no-contact order was issued upon his release from jail, and he was placed on community corrections on December 20, 2019, while awaiting trial.

[8] Within twenty-four hours of the October incident, DCS began investigating. Katherine Krabtree, who performed the initial assessment for DCS, spoke separately with both Mother and Father. Ultimately, Krabtree recommended that the Children remain in Mother's care under certain conditions, including that Mother complete a domestic violence assessment and follow any resulting recommendation and that she cooperate in the criminal matter involving Father. Additionally, Mother indicated that she would change the locks to her home, which she did, and that she planned to obtain a protective order.

[9] DCS filed the instant CHINS petitions on October 27, 2019, based on Mother and Father's alleged failure to provide the Children with a "safe, stable, and appropriate living environment free from domestic violence." *Appendix* at 38. DCS alleged further that Mother and Father had not taken necessary action to address their domestic violence issues and that the family was in need of services that they were unlikely to receive without DCS and court involvement.

[10] At the initial hearing on October 28, 2019, the trial court, among other things, ordered the Children to remain in Mother's home contingent upon her not allowing Father to reside in the home and her participating in a domestic violence assessment and following all recommendations. The court also ordered home-based therapy for Mother. Father did not appear at the hearing.

[11] A contested factfinding hearing was held on February 19, 2020. Mother acknowledged the domestic violence incidents as set out above but indicated that she was not worried that another one might occur. She testified that she and Father had talked about starting marriage counseling, which had always been available to them through her employer. Mother acknowledged that she had the no-contact order dismissed in Father's pending criminal case[1] because she wanted to try to "work things out" with him. *Transcript* at 77. Just prior to the factfinding hearing, Mother tried to file for a protective order to appease DCS, though she did not believe it was needed. Additionally, Mother

---

[1] The dismissal of the no contact order occurred on January 8, 2020.

expressed frustration regarding the speed at which DCS was providing services and testified that she could access services on her own. When asked by the trial court if she considered herself a victim, Mother responded, "Yes, maybe…. Um, yes and no, I guess." *Id*. at 94-95.

[12] Mother had completed the domestic violence assessment on December 26, 2019, two months after it was ordered by the court. The assessor, Alexandra Swackhamer, testified that Mother acknowledged being both a victim and an aggressor with Father and admitted to pushing, shoving, throwing and breaking objects, and jealousy in the past. Swackhamer recommended that Mother participate in a twenty-six-week program through Families First called "Women Who Use Force."[2] On February 11, 2020, Mother contacted Families First and scheduled to start the program on February 19, after the factfinding hearing.

[13] Father testified that he loves Mother and wants to save their marriage. In addition to domestic violence with Mother and pending charges related to the October incident, Father acknowledged that he has had domestic violence issues in the past with two other women with whom he shares children. The first took place in 2013 and resulted in misdemeanor convictions for domestic

---

[2] Swackhamer explained that this is a "psycho-educational group" that "provid[es] education on what is domestic violence, what is the cycle, talk about the effects of domestic violence on victims, on children, would talk about healthy coping skills, healthy relationships and communication skills." *Transcript* at 56.

violence and criminal mischief.[3]  As a result, Father completed a twenty-six-week domestic violence class.  Father claimed to be the victim of the second unrelated incident, the date of which is unclear.  Father testified that he believed additional domestic violence classes and marriage counseling would be beneficial to him and his family, though he did not believe the family needed help from DCS.

[14]  DCS family case manager Cynthia Rees-Cochran testified regarding her concerns and the services she believed the family needed to address their issues with domestic violence.  Of particular concern to her was that Mother had expressed regret for involving the police during the October incident and had sought dismissal of the no-contact order.  Rees-Cochran noted the severity of the October incident, which involved both D.L. and Mother being injured and Father placing his hands on R.Lu., and that domestic violence is a cycle that is difficult to break.  Rees-Cochran testified that Mother had been receptive to services and that the delay in her domestic violence assessment was due to DCS, not Mother.

[15]  At the conclusion of the hearing, the trial court took the matter under advisement.  The court directed as follows in the meantime:

---

[3] Father has other convictions unrelated to domestic violence – a Level 5 felony conviction in 2015 for leaving the scene of an accident involving death and a Class B misdemeanor conviction for criminal mischief in 2018.

You all have acknowledged that you need some counseling and therapy. I am hoping when I see you again, it is done. Then I can close the case out.... I will authorize father to have time with the children up to and including allowing him to transition back into the home, pending positive recommendations of service providers.

*Id*. at 127.

[16] On May 14, 2020, the trial court issued its order adjudicating the Children to be CHINS. The trial court made extensive findings of fact, of which we set out the following to supplement the facts above:

22. ....Mother minimizes the domestic violence issues in her marriage. Calling things 'a little bit of a scuffle', 'we kinda pushed and shoved', 'I may have slapped him', and making dismissive gestures....

23. Mother acknowledges DV incidents in May and October of 2019, both of which occurred in front of the children. Mother does not believe there will be any other incidents of DV although she has not participated in any counseling and neither has Father. Mother acknowledges that she needs marriage counseling but she has not participated in any counseling.

24. Mother asked to dismiss the criminal no-contact order previously because she does not feel that their issues should be 'put on the children'. Mother does not understand the need for domestic violence counseling or how it can negatively impact children.

****

26. Mother only recently tried to get a protective order because she wanted to appease DCS. She does not see a need for a protective order even though there have been repeated incidents of domestic violence in front of the children.

27. Mother claims to see the benefit of DV counseling but the Court questions her motivation in saying that and her motivation in following through with recommended and necessary treatment.

28. Mother wants marriage counseling and she sees a need for it. Mother sought out therapy and has an intake scheduled for next week....

29. Mother claims that she can get help on her own without DCS assistance but she has not until recently arranged for her own therapy.

30. There was previously a criminal no-contact order that was dismissed because Mother did not see a need for it.

31. Mother does not recognize that children who view DV are traumatized and need counseling and she does not even view herself as a victim of domestic violence, even after she has had to call the police on two occasions and has had two separate incidents of domestic violence in front of the children.

****

34. Father had previously completed a 26 week course for Domestic Violence but Father also does not understand the complexities of domestic violence and how it creates a toxic environment for all involved. Therefore the Court deems that

prior counseling unsuccessful. Father was offered services in this matter and he has not meaningfully participated in them.

35. Parents have not addressed the DV issues instead waiting and hoping the CHINS matter would 'go away'.

36. The Court is not swayed with the claims of parents that they will do whatever it takes, and they will do whatever services are needed, without coercive intervention of the Court.

**** 

39. Mother needs DV counseling because of her prior incidents of DV and she needs individual therapy to then become family therapy. Mother has taken action that has indicated she wishes for this matter to go away by stating that she wished she ha[d] never called the police and when she dropped the protective order.

**** 

42. It is necessary for the Court to be involved because of the nature of domestic violence and the nature of this couples' [sic] domestic violence which absolutely requires counseling to be in place. Neither parent fully appreciates the far reaching effects of domestic violence. Given father's prior incidents with other sexual partners, parents need to participate in DV counseling and family therapy. Considering how neither parent sees themselves as a 'victim' when in fact they both are, the Court finds that coercive intervention is necessary.

*Appendix* at 153-54.

[17] At the dispositional hearing on June 10, 2020, the trial court ordered Mother and Father to complete their respective domestic violence programs and continue participating in home-based individual therapy. Additionally, over DCS's objection but with the approval of the Guardian ad Litem, the court allowed Father to move back into the family home while receiving services. Mother now appeals on the basis that there was insufficient evidence to support the CHINS determination.[4]

## Discussion & Decision

[18] A CHINS proceeding is a civil action that requires DCS to prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). On review, we neither reweigh the evidence nor judge the credibility of the witnesses and will consider only the evidence and reasonable inferences that support the trial court's decision. *Id*. We will reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id*.

[19] There are three elements DCS must prove for a child to be adjudicated a CHINS.

> DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation

---

[4] Father does not participate in this appeal.

that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court.

*Id.* (footnote omitted). In this case, DCS alleged that the Children were CHINS under the general category of neglect as defined in Ind. Code § 31-34-1-1.

[20] It is well established that the purpose of a CHINS adjudication is to protect the children, not punish the parents. *K.D.*, 962 N.E.2d at 1255. The focus of a CHINS proceeding is on "the best interests of the child[ren], rather than guilt or innocence as in a criminal proceeding." *Id.* (quoting *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010)) (observing that there are circumstances in which a CHINS adjudication may be made where neither parent is at fault or where only one parent is responsible). Thus, when determining CHINS status, particularly the coercive intervention element, which is of issue in this case, courts should consider the family's condition not just when the case was filed, but also when it is heard so as to avoid punishing parents for past mistakes when they have already corrected them. *In re D.J.*, 68 N.E.3d 574, 580-81 (Ind. 2017).

[21] On appeal, Mother does not dispute that the Children were negatively impacted by the domestic violence between Mother and Father that occurred in their presence in May and October 2019. Nor does she challenge the fact that Father has a history of domestic violence with two other women, including a prior conviction. Her sole argument is that she and Father, to whom she plans to remain married, can obtain domestic violence treatment and work out their marital problems without the coercive intervention of DCS or the court. In this

regard, Mother disputes the trial court's suggestion that she did not appreciate the seriousness of domestic violence experienced in her marriage and that she was not diligent in seeking treatment. Mother asserts that the CHINS adjudication "served no purpose other than to needlessly interfere with a family whose children were not in any danger and whose parents did not need any coercion to take care of their family issues." *Appellant's Brief* at 7.

[22] We reject Mother's invitation to reweigh the evidence, and we conclude that the evidence and reasonable inferences favorable to the trial court's decision support the CHINS adjudication. While Mother took steps to protect the Children immediately after the October 2019 incident, which we commend, shortly thereafter, she had the no-contact order in the criminal case dismissed and expressed regret for involving the police. Further, despite their stated desire to work things out, Mother and Father delayed seeking marriage counseling and domestic violence services either independently or together. Mother correctly observes that DCS delayed making referrals, but Mother is the one claiming that she can obtain these services on her own. In fact, Mother testified that she has always had marriage counseling available through her work. However, Mother and Father did not engage in counseling after the domestic violence in May or October 2019 and had not begun it at the time of the factfinding hearing in February 2020.

[23] The evidence shows that domestic violence is a real, ongoing threat in this case. Mother and Father have engaged in domestic violence in the presence of the Children at least twice, and two of the Children were physically impacted

during the most recent incident. Father continues to face criminal charges for the October 2019 incident. Further, Father has a history of domestic violence with two other women, including a conviction for an episode in 2013. Father completed a domestic violence program following that conviction, but the program ultimately proved unsuccessful for him.

[24] The trial court found that Mother and Father do not grasp the seriousness of their situation, and the evidence bears this out. As noted by the trial court, Mother essentially downplayed the domestic violence occurrences during her trial testimony, as well as her role as a victim. Further, even though they had yet to engage in any counseling and Father has a history of domestic violence, Mother testified that she believed there would be no additional domestic violence between her and Father.

[25] Ultimately, the trial court determined that it was "not swayed with the claims of parents that they will do whatever it takes, and they will do whatever services are needed, without coercive intervention of the Court." *Appendix* at 153. The court felt that Mother and Father were just "waiting and hoping the CHINS matter would 'go away'" rather than tackling the issues head-on. *Id*. Contrary to Mother's assertions on appeal, the evidence supports the trial court's determination by a preponderance of the evidence that Mother and Father are "unlikely to participate in the necessary care and treatment without the coercive intervention of the Court." *Id*. at 154.

[26] Judgment affirmed.

Mathias, J. and Weissmann, J., concur.